STATE OF IOWA ex rel. JAMES KEARY et al., Appellees, v. G. A. MOHR et al., Appellants.

**ELECTIONS:** Qualifications of Voters—Residence—Intent. Testi-
1   mony by a party who claims to be a legal voter in a certain precinct, as to his intent in the matter of residence, is, of course, not conclusive as to the fact of residence. Testimony held to present a jury question.

**ELECTIONS:** Qualifications of Voters—Residence of Wife. The resi-
2   dence of a wife for voting purposes is presumptively the same as the residence of her husband.

**ELECTIONS:** Qualifications of Voters—''Settlement'' of Poor Person.
3   Sec. 2224, Code, 1897, providing the circumstances under which a poor person may acquire a *settlement* for the purpose of public financial relief, has no application to the question of the acquisition of a *residence* for voting purposes.

**SCHOOLS AND SCHOOL DISTRICTS:** Dissolution of District—Stat-
4   ute of Limitation. Ch. 211, Acts 39 G. A. (Supp. Comp. Code, Sec. 2534-a1), limiting the time in which the legality of the organization of a school district may be questioned, does not apply to the question whether a duly organized district has been legally ''*dissolved.*''

**QUO WARRANTO:** Proceedings and Relief—Laches. Laches in
5   bringing quo warranto action may not be entertained as a defense unless it is made to appear that, in equity and good conscience to others, the action should have been sooner brought.

**SCHOOLS AND SCHOOL DISTRICTS:** Dissolution—Legality of Peti-
6   tion. A petition for the dissolution of a consolidated school district

is not fatally defective because, in describing the several districts
into which it is proposed to divide the dissolved district, one of the
boundary lines of a proposed district is omitted, the intent of the
petition as a whole being manifest, and the said omission not having
misled anyone.

*Appeal from Calhoun District Court.*—E. G. ALBERT, Judge.

JUNE 24, 1924.

THIS is a quo warranto proceeding, whereby it is sought to
adjudicate the dissolution of a school district corporation. The
relators are voters and taxpayers in the district, and the de-
fendants are the corporation and its officers. There was a judg-
ment of ouster, and the defendants appeal.—*Affirmed.*

*Healy & Breen, J. F. Lavender,* and *Stipp, Perry, Ban-
nister & Starzinger,* for appellants.

*Salinger, Reynolds, Meyers & Cooney,* for appellees.

EVANS, J.—The corporation is known by the name "Inde-
pendent Consolidated School District of Yetter," and is located
in Calhoun County. It was organized pursuant to statutory

1. ELECTIONS: qualifications of voters: residence: intent.

procedure, on February 25, 1920. Its officers
were duly elected on March 20, 1920, from which
date it functioned as a going corporation. In
purported pursuance of statutory procedure proposing a dis-
solution thereof, an election was held on November 16, 1921,
wherein the proposition was submitted to the voters "for" and
"against" dissolution. The corporation officials, acting as
judges of the election, announced the result of such election as
a tie vote, being 122 "for" dissolution and 122 "against" dis-
solution, and declared the proposition lost. This proceeding is
in the nature of a contest of the decision of the judges of elec-
tion thus announced. It is not a challenge to the legality of the
original organization of the district as a school corporation.
The contention of the relators is that the result of the said elec-
tion of November 16, 1921, was not a tie, as announced by the
judges of election; that, on the contrary, a majority of the

votes cast were in favor of the dissolution; and that such major-
ity vote worked a legal dissolution of the corporation. The pri-
mary issue tried was whether a majority of the votes cast was
in favor of the dissolution.

It appears that 254 ballots were deposited in the ballot box.
The judges of election rejected 10 of such ballots, as having
been improperly marked and as being unintelligible. Of the
remaining 244 ballots, 122 were counted "for" dissolution and
122 "against."

On the trial below, the court found that five of the ten re-
jected ballots were properly rejected, and that the other five were
improperly rejected, and therefore should have been counted.
Of the five ballots improperly rejected, four were "for" dis-
solution and one "against." No complaint is made of such
finding. On this basis, the vote would have stood 126 "for"
and 123 "against." But the court also found in this connec-
tion that Ungrue, who had voted "for," and Scaarup, who had
voted "against," were not electors, and their votes were de-
ducted from the respective totals. On this basis, the vote stood
125 "for" and 122 "against." These totals would, of them-
selves, be decisive of this issue, were it not for the contention
of defendants that it was not sufficient for the relators to show
that a larger number of ballots were cast "for" the dissolution
than were cast "against" it, but that such larger number so
cast "for" must be a majority over *all votes cast* by legal elec-
tors, whether such votes were intelligible and countable or not;
and that the five rejected ballots must be included in the count
for the purpose of determining whether there had been a *ma-
jority* "for" dissolution. To this contention, the relators inter-
posed a twofold resistance: (1) That the point was not ten-
able in law; (2) that three of the votes counted "against" dis-
solution were cast by nonelectors, Culver and Yepson and Mrs.
McCullough, and that such votes must, therefore, be deducted
from the count. An issue was made upon the legality of these
three votes. The case was tried to a jury. By agreement of
the parties, the question whether Culver, Yepson, and Mrs.
McCullough, or either or any of them, were electors was sub-
mitted to the jury for special findings. The other issues of fact

were by agreement submitted to the court. The jury returned special findings adverse to the legality of the vote of each of the three named persons. One of the principal questions now presented to us is whether the court should have held, as a matter of law, upon the record, that each of the three persons in question *was* a legal voter. We give our first attention to it.

I. Taking first the case of Yepson. Yepson had formerly lived at Yetter. In November, 1919, he went to Kanawha, and was there continuously until November, 1921, engaged in his brother's store. On November 3, 1921, he came to Yetter, to engage temporarily in husking corn for his brother. He remained in that work until December 10th following, and then returned to Kanawha, where he had remained up to the time of the trial. It will be seen that the question of his residence turned on the question of his own real intent and purpose. If he intended to retain Yetter as his home and to return thereto, it was within his legal right to do so. If he intended to take up his legal residence at Kanawha, that also was within his legal right. He was an unmarried man. He paid his poll tax at Kanawha. On trips away from Kanawha, he had registered his residence as "Kanawha" on the hotel registers. He was a member of the baseball team of Kanawha and of the American Legion of that place. Confessedly, he was by his own intent a resident of Kanawha on and at all times after January, 1922. He did testify that it was in January, 1922, that he formed the purpose of becoming a resident of Kanawha. But no change had occurred in his outward attitude at that time. The court submitted the question to the jury whether Yepson had, prior to November 16, 1921, become in purpose a resident of Kanawha. If yea, he was not a legal elector at Yetter. The finding of the jury was adverse to the claim of residence at Yetter. We think the evidence was such as to make a fair question for the jury. Though Yepson had a right to testify to his own purpose, and though such purpose were controlling, and though no other witness could directly contradict his testimony in that regard, yet his testimony was subject to contradiction by the circumstances and by his conduct. From these, the jury had a right to find that he had in purpose taken his residence at

Kanawha prior to November 16th, notwithstanding his testimony to the contrary.

Turning to the case of Culver. He was a teacher in the consolidated school. He began his employment there in September, 1921. His contract of employment terminated in March, 1922. Prior to September, 1921, he had been a resident of Hubbard, in Hardin County, Iowa, for more than ten years. He owned a home there. His family, consisting of wife and son, were occupying that home at Hubbard while he was engaged in teaching at Yetter. His testimony as to his purpose was that he intended to make his home at Yetter as long as his employment should continue. So far as his present contract was concerned, he had no intention to stay there longer than until March, 1922, unless he could secure a renewal of the contract. It appears also that, during the ten preceding years while he had continued his home at Hubbard, he had been continuously engaged in teaching in various towns successively. He had taught at Otteson for four years. During part of that time, he had taken the wife and son with him, taking along sufficient furniture to keep house. At the end of the school year, they returned to the home at Hubbard, and this they did every year. He taught for a year at Troy, while the wife and son remained in the home at Hubbard. He taught also at Kinross, while his family remained at the Hubbard home. He taught a year at Crystal Lake, and took his family with him. The Hubbard home was locked up during their absence. At the close of the school year, they all returned thereto. While he was teaching at Yetter, his son was attending the high school at Hubbard as a resident pupil, and paying no tuition. The father maintained a post-office box in the town of Hubbard at all times. We think these circumstances were abundant to warrant a submission of the issue to the jury. The jury finding was adverse to the legality of his vote.

Turning to the case of Mrs. McCullough, it appears that she was a married woman, who had lived with her husband at Pomeroy, Iowa, until September preceding the election. At that time, she came to the home of her daughter at Yetter. Her husband maintained his residence at Pomeroy. This was suffi-

cient to establish her prima-facie residence at Pomeroy. To meet this prima-facie case, she testified for the defendants as follows:

"I formerly lived at Pomeroy. I was married to Mr. McCullough in 1898. We have one daughter. She is married. Her name is Mrs. Frank A. Gurget. She and her husband live

2. ELECTIONS: qualifications of voters: residence of wife.

at Yetter. During our married life I have always contributed to my own support and that of my daughter. I was a dressmaker in Pomeroy. I have kept roomers and boarders. I bought some of the furniture for the house. Mr. McCullough has used liquor. He has frequently been intoxicated. I moved over to Yetter the first week in September, 1921, and moved the furniture over there. I have been living over there ever since.

"Q. Who lives with you in Yetter? A. My daughter and her husband. Myself and my daughter and her husband lived in the same home since we have been in Yetter. I moved to Yetter intending to make it my home. That has been my intention ever since, and is now. I have never been back to Pomeroy since I have lived in Yetter, only to visit friends. My husband has no home there to visit. I have no intention of going back to Pomeroy to live. Before I left Pomeroy, Mr. McCullough was away a large portion of the time. He was away perhaps a third of the time."

It further appears that her husband visited her at Yetter since her arrival there, and that he spent a week with her in the daughter's home at one time. Though he had no house in Pomeroy, she did have one. The point urged in the

3. ELECTIONS: qualifications of voters: "settlement" of poor person.

lower court was that her testimony showed conclusively that she was a resident of Yetter, and not of Pomeroy, and that the court erred in submitting the issue to the jury. It is further argued that she had a right to change her residence at any time, pursuant to Code Section 2224, which provides:

"3. A married woman abandoned by her husband may acquire a settlement as if she were unmarried."

The quoted section has no application to the case, for several reasons:

(1)   There is no showing that Mrs. McCullough had been abandoned by her husband.

(2)   The quoted section has no application to the subject-matter here under consideration. It is a part of the Code chapter pertaining to the support of the poor and the obligation of public officials to render public support to those having a "settlement" within their jurisdiction.

It is urged, however, that a married woman who has separated from her husband permanently may acquire a domicile elsewhere than at his domicile. We have so held in divorce cases, where grounds of divorce and permanent separation were shown. In such a case, jurisdiction in an action for divorce or for separate maintenance may be acquired by the district court of the county of the residence of either party. If we should say that the evidence tends to show that this lady had good grounds of divorce, in that her husband had "used liquor," or had failed to support her, or that she had really separated permanently from her husband, yet such evidence is far from conclusive. On the contrary, it is very meager. The relators having made a prima-facie showing that her residence was at Pomeroy because that was the residence of her husband, the burden was on the defendants to meet such prima-facie showing. The doubt upon this record on this point is whether there was sufficient showing by the defendants to justify a submission of the issue to the jury. The trial court faced the alternative either to instruct the jury peremptorily, upon the prima-facie showing made by the relators, or else to submit the issue to the jury, upon the evidence of Mrs. McCullough, tending to rebut the prima-facie showing. It is clear to us that the defendants were not entitled to a peremptory holding in their favor at this point. It is not so clear but that the relators were entitled to a peremptory holding. In any event, the submission of the issue to the jury was without prejudice to the defendants, and they are in no position to complain.

It is further argued, however, that the court erred in the form of its instruction on this subject, and that such instruction was itself erroneous. No such point was made before the trial court, and it is not available to the appellants here. They

requested a specific instruction on the subject, which was a per-
emptory direction to the jury to find in their favor on that
question.

It follows from the foregoing that the three persons here
named were not electors of the district, and their votes should
not be counted for any purpose. This reduces the total num-
ber of votes cast, to a maximum of 249, of which 125 were for
dissolution. This was necessarily a majority, and we have no
occasion to consider the question of law, much argued in the
briefs, as to whether the unintelligible ballots cast by legal voters
should be counted for the purpose of determining the question
of majority. The net result was 125 votes "for," 119 votes
"against," and five spoiled and unintelligible ballots. This
majority vote, under the statute, was effective to dissolve the
corporation. It remains to consider certain affirmative defenses.

II. It is contended that the action was barred by the stat-
ute of limitations, reference being had to Chapter 211, Acts of
the Thirty-ninth General Assembly.

It is very doubtful whether the answer of the defendants
can fairly be construed to plead the statute of limitations. Be
that as it may, is the statute referred to available? The chapter
in question provides as follows:

"Sec. 1. No action shall be brought questioning the legal-
ity of the organization of any school district in this state after
the exercise of the franchises and privileges of a district for the
term of six months.

"Sec. 2. Every school corporation shall, for the purpose
of this act, be deemed duly organized and to have commenced
the exercise of its franchises and privileges when the president
of the board of directors has been elected, and the record book
of such corporation duly certified by the acting secretary thereof,
showing such election and the time thereof, shall be prima-facie
evidence of such facts."

This enactment became generally effective on April 13,
1921. It was made applicable to existing corporations thereto-
fore organized, allowing, however, thirty days from and after

4. SCHOOLS AND
SCHOOL DIS-
TRICTS: disso-
lution of dis-
trict: statute of
limitation.

April 13, 1921, for the bringing of an action against such previously existing corporations. It will be seen that the legislation has no applicability to the case before us. The legality of the original organization of the district is not involved in this proceeding. If it were, the action would have become barred on May 13, 1921. The right of action here pursued did not arise prior to November 16, 1921. If, therefore, the statute in question were effective to bar this action, it would so bar it before it arose. The action was brought in June, 1922. The only statute of limitations applicable to it is the general statute relative to quo warranto proceedings. It is not claimed that such statute had run prior to the beginning of the action. This plea of the statute, therefore, cannot be sustained.

III. It is further urged that the relators were guilty of laches in having delayed the bringing of this action. Having brought their action within the statutory period of limitation, they are no more subject to the defense of laches

5. QUO WARRANTO:
proceedings and
relief: laches.

than they are to the plea of statutory limitation, unless some special reason is made to appear why, in good conscience and justice to others, they should have proceeded earlier. It is made to appear in this case that, upon the pronouncement of the judges of election that a tie vote had resulted, such announcement was taken to be true. On December 5th following, the board of directors entered into a tentative arrangement with proposed bond purchasers for the sale of $65,000 worth of bonds. It appears that an election was immediately called, to vote upon the bonds, for January 13, 1922; that proceedings were instituted by the relators and others for another test vote on the question of dissolution, and an election was held on January 27, 1922; that this election went against the relators; that, on March 22d, an election was held for the election of directors, and these relators participated therein, and one of them was a candidate for election as director. These are the events that had happened prior to the beginning of this action which are pointed out as sustaining the defense of laches. If these are effective now to that end, they were effective immediately upon their occurrence. In order to

avoid the effect of such events, the relators would have been required to anticipate and precede them. To precede all of them, the action should have been commenced prior to December 5th. To precede any of them, it should have been commenced not later than March 22d. If it had been brought prior to March 22d, would the previous events be sufficient as a plea of laches? Without pursuing this line of query, it is to be noted that defendants make no claim of actual knowledge by the relators that they had a cause of action as the result of the mistaken announcement made by the judges of election. It is argued, however, that they had constructive knowledge, in that the records were open to them, and that they could have ascertained all that they have learned since. If this be true as to matters of record, it is not true that they had knowledge, constructive or otherwise, that illegal votes had been cast against the dissolution; nor, indeed, that illegal votes had been cast at all. Even if they had been chargeable with notice that non-electors had voted, yet they were not chargeable with knowledge as to how they had voted. These facts were ascertained in the course of the trial and by resort to court process. This want of knowledge on the part of the relators of facts essential to their suit is quite a complete answer to the plea of laches.

On the question of the operation of the schools and employment of teachers, the trial court made a provisional order that protected both public and private interest in that regard. It appointed the defendant directors as trustees to carry on the schools for the ensuing year and to perform the contracts made with the acting teachers. The contract for the purchase of a school site was tentative only; likewise, that for the sale of bonds: and the purported purchase price of the bonds still remains in the hands of the purchasers. Innocent third parties were in no wise misled to their injury, and no question of that kind is presented.

IV. It is further urged by the defendants that the election of November 16, 1921, was void because the petition presented to the county superintendent for the calling of such

election was defective, and failed to confer juris-
6. SCHOOLS AND
SCHOOL DIS-
TRICTS: disso-
lution: legality
of petition.
diction upon him to call such election. The
argument here takes a much wider scope than
the point made in the trial court. The answer
charged that the petition was indefinite, uncertain, and mislead-
ing, in that it did not provide for a return of the territory
therein to the same districts to which the same originally be-
longed, prior to the submission of the said petition. The peti-
tion contained the following:

"And we would ask that said district above mentioned be
dissolved, and that said lands embraced in said district be or-
ganized and formed as they were originally, prior to the con-
solidation of said independent school district of Yetter, Calhoun
County, Iowa, giving to said new proposed district, after the
dissolution of the district herein mentioned, the same bound-
aries and rights under the law as then existed, with such amend-
ments as made by law."

The territory of the consolidated district had been taken
from the subdistricts of district school townships. The peti-
tion purported to describe specifically the constituent subdis-
tricts, being six in number. The description of the subdistricts
purported to describe four sections for each subdistrict. As to
two of these subdistricts, the description contained in the peti-
tion was defective. Subdistrict No. 6 bounded Subdistrict No.
4 on the south, so that they had a common boundary. Subdis-
trict No. 4 bounded Subdistrict No. 2 on the south, so that they
had a common boundary line. The description of Subdistrict
No. 6 omitted the common boundary line between it and Sub-
district No. 4. Subdistrict No. 6, however, was in Jackson Town-
ship, and was the only part of the defendant corporation which
had been taken from Jackson Township, the remainder of such
district all being contained in Elm Grove Township. The de-
scription of Subdistrict No. 4 set forth its south boundary line,
which was the common boundary line between it and Subdis-
trict No. 6, but it failed to set forth its north boundary line,
which was the common boundary line between it and Subdis-
trict No. 2. This line was set forth in the description of Sub-
district No. 2. These defects did not appear in the notice of

election, nor is it claimed that any voter was in any manner misled thereby. The claim is that the defect was fatal to jurisdiction. To so hold, would be to say, in effect, that perfection of procedure is required, in order to confer jurisdiction in such a case. We have repeatedly held that perfection is not the standard in such a case, and that it is seldom, if ever, obtained in any procedure conducted by nonprofessional officials. We do not think that the defect pointed out in this case was of that substantial character which would defeat the jurisdiction of the superintendent to issue the notices and to call the election.

Other questions argued in the briefs are rendered immaterial by our conclusion announced in the first division hereof. We find no prejudicial error in the record, and the judgment below is, accordingly, affirmed.—*Affirmed.*

ARTHUR, C. J., PRESTON and FAVILLE, JJ., concur.